PASCUA YAQUI TRIBE
COURT OF APPEALS
10:00 pm, 29 March, 2009
CLERK OF COURT
ISSUED

No. CA-08-015

**Pascua Yaqui Tribe Court of Appeals**

_____

**Pascua Yaqui Tribe, Plaintiff/Appellee**

**v.**

**Miranda, Beatrice, Defendant/Appellant**

**OPINION**

Appeal of a decision of the Pascua Yaqui Tribal Court in Case No. CR-08-119, the

Honorable Cornelia Cruz presiding.

**AFFIRMED**

Alfred K. Urbina, Esq., Pascua Yaqui Tribe Office of Prosecutor, Tucson, AZ, for the

Plaintiff/Appellee.

Nicholas Fontana, Esq., Tucson, AZ, for the Defendant/Appellant.

## I. STATEMENT OF THE FACTS

On the evening of January 25, 2008, Beatrice Miranda, by all accounts wandering

around, drunk, came across Monica Valenzuela, a minor Yaqui teenager.  (Transcript D at 5-7,

24-27).   Miranda seems to have thought someone was laughing at her; she pulled a knife,

screaming obscenities, and began chasing the girl across the reservation.  (Transcript D at 24-

27). Monica made it home, just ahead of this woman, and ran inside, where she was able to alert

her sister, Bridget, that Miranda was in their yard, yelling and waving a knife around. (Transcript D at 26). Bridget went outside to investigate. (Transcript D at 13). Miranda threated to kill the girls, brandishing the weapon. (Appellant's Opening Brief at 54). They called the police, and she ran off. (Transcript D at 14-21, 25-29).

Miranda was picked up, based on their description, near the Valenzuela home. (Transcript D at 4). With some difficulty, they were able to restrain and arrest her. (Transcript D at 4-6). She was searched, pursuant to this arrest; the police found a folding knife on her person, later confirmed to be the weapon used in the assault. (Transcript D at 7-10, 22-23, 30-32).

On January 26, 2008, the Tribe filed a criminal complaint against Miranda, charging her with two counts of endangerment, two counts of threatening and intimidating, two counts of aggravated assault, and two counts of disorderly conduct, one count each for each victim. (*PYT v. Miranda*, Pascua Yaqui Trial Court Record, document 38, hereinafter "R.38")

At her initial appearance, Miranda, without counsel, was advised of her rights, and declared that she was waiving them:

> The Court: The Pascua Yaqui Tribal Court is now in session in the matter of Pascua Yaqui Tribe versus Beatrice Miranda. Docket number CR-08-119.... Let me see, I now will advise you of your rights. You have the right to remain silent. Anything you say may be used against you. You have the right to counsel at your own expense, and you have the right to (inaudible) probable cause in this phase of the proceedings. Do you understand your rights?
>
> Miranda: Yes.

(Transcript A at 2). The court found probable cause and set bail at $1500.00. (R.36).

On February 4, 2008, Miranda appeared at her arraignment, without counsel. She was again advised of her rights, and again waived them:

> The Court: I will advise you of your rights.  You have the right to remain silent.
>
> Anything you say will be used against you.  You have the right to legal counsel at
> your own expense.  You have the right to (inaudible).  Miss Miranda, you have the
> right to cross-examine witnesses and evidence presented by the Tribe, and the right
> present witnesses and evidence in your behalf.  You have the right to know the
> charges against you, and you have the right to appeal to the Pascua Yaqui Court of
> Appeals.  Do you understand your rights?
>
> Miranda: Yes.

(Transcript B at 2-3).  She then attempted to plead guilty to all charges.  The court intervened,

finding an insufficient factual basis, at that time, to substantiate her pleas, (Transcript B at 4-7),

entered not guilty pleas on her behalf, and set a pre-trial hearing date, March 12, 2008.  (R.34).

At pre-trial hearing Miranda appeared, was again advised of her rights, and again waived

them:

> The Court: I will advise you of your rights.  You have the right to remain silent.
>
> Anything you say may be used against you.  You have the right to legal counsel at
> your own expense.  You have the right to a hearing and to a jury hearing.  You have
> the right to cross examine the witnesses, and (inaudible) about the Tribe, and the right
> to examine witnesses in advantage on your behalf.  You have the right to know the
> allegations against you, and you have the right to appeal to the Pascua Yaqui Court of
> Appeals.  Do you understand your rights?
>
> Miranda: Yes.

 (Transcript C at 2).  No motions were made by either party, the case was set for trial on April

12, 2008.  (R.12).

March 12, 2008, the parties submitted a negotiated plea agreement, signed by Miranda.

(R.25).   The agreement detailed her rights explicitly, and explicitly waived them:

I have read and understand the above. I understand I have the right to discuss this case

and my civil rights with a lawyer at my expense. I understand that by pleading guilty I

will be giving up my right to a trial by jury, to confront, cross-examine, and compel

the attendance of witnesses, and my privilege against self-incrimination. I agree to

enter this plea as indicated above on the terms and conditions indicated herein. I fully

understand that if I am placed on probation as part of this plea agreement, the terms

and conditions of probation are subject to modification at any time during

the period of probation in the event that I violate any written condition

of my probation.

(Appellee's Response Brief, Appendix A)

 It was accepted by the court; change of plea hearing set for April 12, 2008.  (R.25).

March 14, 2008, Miranda sent the court a written request to withdraw from the plea

agreement.  (R. 22). The court vacated the change of plea hearing, set the matter for trial, April

12, 2008.  (R.21).

April 12, 2008, Miranda appeared *pro se*.  (R.12). She was advised of her rights, again,

and apparently declared that she was waiving them:

The Court: I will advise you of your rights.  You have the right to remain silent.

Anything you say may be used against you.  You have the right to you own counsel at

your own expense.  You have the right to a hearing.  You have the right to cross

examine witnesses and evidence presented by the Tribe, and the right to present

witnesses and evidence in your behalf.  You have the right to know the charges

against you, and you have the right to appeal to the Pascua Yaqui Court of Appeals.

Do you understand your rights?

Miranda: (No audible response).

(Transcript D at 1-2).

The tribe presented testimony from arresting Officer Jose Montano (Transcript D at 2-12), Bridget Valenzuela (Transcript D at 12- 23) and Monica Valenzuela (Transcript D at 23-32) as well as entering the knife recovered from Miranda on arrest into evidence (Tribe's Exhibit 2). Miranda presented no evidence or witnesses, did not testify, and did not cross-examine any witnesses offered by the prosecution.

The court found her guilty on all counts.  (R.12, Transcript D at 35-36)

While Miranda requested immediate sentencing, the Tribe asked for a pre-sentence investigative report (to be filed by the Office of Probation and Parole), and the court granted this request.  (Transcript D at 36).   Sentencing was scheduled for May 19, 2008.  (Transcript D at 37).

At sentencing, Miranda was again advised of her rights:

> The Court: I will advise you of your rights.  You have the right to remain silent.
> Anything you say may be used against you.  You have the right to legal counsel at
> your own expense.  You have the right to a hearing.  You have the right to cross
> examine witnesses and evidence presented by the Tribe, and the right to present
> witnesses and evidence in your behalf.  You have the right to know the charges
> against you, and in the sentencing matter, you have the right to appeal to the Pascua
> Yaqui Court of Appeals.  And the consequences, uh, in the revocation matter may
> include you being found in violation of you conditions of probation, your probation
> term being revoked or extended, and any suspended days being imposed.  Do you
> understand your rights?
>
> Miranda: Yes.

(Transcript E at 1-2)

The pre-sentence investigative report filed by the Office of Probation and Parole revealed that Miranda was on probation (for conviction in CR-07-064) when she perpetrated her assault against the Valenzuela sisters. (Transcript E at 1-9).

Miranda stated, contrary to her assertions in Appellant's Opening Brief, (Appellant's Opening Brief at 16), that she received a copy of the pre-sentence investigation report:

> The Court: And we will first proceed with the sentencing hearing, uh, CR-08-119.
>
> And in that matter the pre-sentence investigation report has been filed by The Court.
>
> or with The Court rather by the Probation Office. And did you receive a copy of that,
>
> Ms. Miranda?
>
> Ms. Miranda: Yes.

Her probation was revoked. (Transcript E at 9). After hearing the recommendations of the Probation officer, Miranda requested that all of the sentences "run concurrent." (Transcript E at 5). Sentence was imposed, with some of the terms running concurrent:

> The Court: At this time, the Court will enforce sentence as follows, after hearing from the probation officer and the Tribe regarding the history of the Defendant. And the Court does find that the Defendant does have a history of failures to comply, failures to appear, uhm, and failure to comply with the conditions of probation and other orders set by the court. The Court will set sentencing as follow: Count One, three-hundred and sixty-five days in jail; Count Two, three-hundred and sixty-five days in jail; Count three, Endangerment, Count Four, uh, sixty days in jail; Count Four, sixty days in jail; Count five, ninety days in jail; Count Six, ninety days in jail; Count Seven, Seven, I'm sorry, thirty days in jail; Count Eight, thirty days in jail. Counts One and Two are to be served immediately for a total of seven-hundred and thirty days in jail; counts Five and Six will be served consecutive to Counts One and two for a total of one-hundred and thirty days in jail; Counts Five and Six will be

> served consecutive to Counts One and Two for a total of on-hundred and eighty days;
>
> Sentencing, Counts Three, Four, Seven and Eight are concurrent with One, Two, Five
>
> and Six for a total of nine-hundred and ten days in jail.  The Defendant is restrained
>
> for a period of two years from the victims, and Defendant will not possess any type of
>
> weapons, for a period of two years.

(Transcript E at 7-8)  Miranda requested credit for time served and her request was granted, reducing the sentence going forward by one hundred and fourteen days.  (Transcript E at 9-10).

Miranda's criminal history (referred to in Appellant's Opening Brief as her "alleged criminal history," Appellant's Opening Brief at 17) informed the sentencing recommendations made the court by the Probation Office and the final sentence imposed (Appellee's Response Brief, Appendix B clarifies this history, including prior criminal charges brought against Miranda in CR-05-036, (in which she was represented by Chief Public Defender Nicolas Fontana), CR-05-278 (in which she was represented by Deputy Public Defender M. June Harris), and CR-07-064, (in which she was represented by Chief Public Defender Nicolas Fontana); she was on probation for her conviction in CR-07-064 when the incidents in the current case took place (Transcript E at 8-10)).

It is unclear in the record why Miranda chose not to retain the services of the Public Defender's Office in this case; she had ample familiarity with them from past experience, as attested to above.

The Pascua Yaqui Public Defender entered its notice of appearance on behalf of Miranda on June 10, 2008.  (R.3)  Miranda's Notice of Appeal was filed on June 26, 2008.  (R.1).

Oral argument was heard on this appeal on March 17, 2009.

## II. STATEMENT OF THE ISSUES

1. Did the court fail to properly advise the Appellant of her rights as guaranteed by the Constitution of the Pascua Yaqui Tribe and the Indian Civil Rights Act, and was she thereby deprived of due process of law?

2. Was inadmissible evidence wrongly admitted, and did admission of such evidence deprive the Appellant of her rights to confront her accusers and be given a fair trial as guaranteed by the Constitution of the Pascua Yaqui Tribe and the Indian Civil Rights Act?

3. Did the Court make a negative inference to the Appellant's invocation of her right to remain silent, and did any such inference deprive her of her right to be free from self-incrimination as guaranteed by the Constitution of the Pascua Yaqui Tribe and the Indian Civil Rights Act?

4. Did the court err in exercising jurisdiction over the Appellant?

5. Was the court's conviction of Appellant on counts five and six of the complaint improper?

6. Did the sentence imposed by the court violate the Indian Civil Rights Act?

## III. OPINION

**1.  The trial court properly advised the Appellant of her rights as guaranteed by the Constitution of the Pascua Yaqui Tribe and the Indian Civil Rights Act, and she was not deprived of due process of law.**

Appellant has submitted a lengthy narrative (Appellant's Opening Brief at 26-36) detailing her experiences at every stage of the pretrial and trial process, attempting to make the claim that she was, at no point, properly advised of her rights.  This attempt fails, as her recitation of events only demonstrates that she was amply advised of those rights, and waived them, repeatedly.  She contends that her waiver of the right to retain counsel at her own expense (or to solicit the services of the Public Defender's office) was improper, or defective, because the court did not

recount her rights in sufficiently exhaustive detail for a waiver to have been effective.  I find that the waiver was effective, both generally, based on the advisories repeatedly provided her by the court, and specifically, given her particular levels of knowledge and experience.  *North Carolina v. Butler* 441 U.S. 369, 373 (1979).

While Appellant put forth an elaborate collection of arguments predicated upon her unfamiliarity with the Pascua Yaqui criminal justice system, going so far as to refer to herself as an "alleged" Indian (Appellant's Opening Brief at 46) and challenge the Tribe's demonstration of subject matter jurisdiction over her, (Appellant's Opening Brief at 42-47) she is in fact intimately familiar with the workings of the system, and her familiarity is born of direct personal experience.  Appendix B of Appellee's Response Brief testifies to this experience: Appellant appeared before the Pascua Yaqui criminal court on three separate occasions prior to being charged with the offenses under examination (CR-05-036, CR-05-278, and CR-07-064), and was in fact on probation for conviction in CR-07-064 the night the incidents in this case took place. (Transcript E at  8-10).  On all three of these occasions she availed herself of the services of the Public Defender's Office, (Appellee's Response Brief, Appendix B) and indeed was personally represented in two by the Chief Public Defender, her counsel on this appeal (who presumably would have raised various issues, such as the question of subject matter jurisdiction, on those other occasions, CR-05-036 and CR-07-064, had they had merit).  Appellant simply cannot sustain the argument that she was unaware of her rights, or that she only waived representation by counsel in this case because some defect in the court's instructions prevented her from either learning of the existence of the Public Defender or acquiring the means to contact him.  Within this context, the instructions offered by the court to Appellant, at every stage of the process, regarding her rights were more than sufficient to meet the constitutional requirements of due process, and her waiver of those rights was more than adequate to have been effective.

Any possible defect in the court's repeated admonishments to Appellant not cured by her extensive personal knowledge of the Pascua Yaqui criminal justice system would have been corrected through her voluntary adoption, by signature, of the plea bargain agreement she entered into with the Tribe.  This agreement detailed her rights exhaustively.  (Appellee's Response Brief Appendix A).

Appellant's entire argument, that her successive, consistent, waivers of the right to counsel were ineffective for purposes of due process, is based upon upon this Court's decision in *Pascua Yaqui Tribe v. Ramirez*, CA-02-003 (2006).  *Ramirez,* however, was a different case and does not apply, as it was "limited to those circumstances where a criminal defendant is required by the trial judge to proceed involuntarily, *pro se*, without legal counsel or an advocate in his or her defense in a criminal trial" (*Ramirez* at 7).  Appellant was not required to proceed without counsel, she chose to proceed without counsel.  She was informed at each step of her right to retain counsel (Initial Appearance, Appellant's Opening Brief at 26 citing Transcript A at 2; Arraignment, Appellant's Opening Brief at 28 citing Transcript B at 2; Pre-Trial Hearing, Appellant's Opening Brief at 30 citing Transcript C at 2; Trial, Appellant's Opening Brief at 34 citing Transcript D at 2; at Sentencing, Appellant's Opening Brief at 35 citing Transcript E at 2-3, the right to counsel did not apply); at each step she affirmed that she understood that right and had decided to waive it.  Her contrary decision on three prior occasions to retain the services of the Public Defender's Office conclusively demonstrates that she was fully aware of this option, knew how to exercise it, and made a voluntary, informed choice, in this case, not to do so.

Further, under the the Pascua Yaqui Constitution, the Indian Civil Rights Act, and the United States Constitution, criminal defendants before the Pascua Yaqui court have the right to retain counsel at their own expense, not the power to demand counsel be provided at public expense.  Art.I § 1(f), Const. Pascua Yaqui Tribe; 25 U.S.C. § 1302(6)(2001); *United States v. Bird*, 287 F.3d 709, 713 (8th Cir. 2002).  The Pascua Yaqui Tribe has chosen to fund an Office

of the Public Defender to defend indigents; nothing in federal law or the Yaqui Constitution compels it to do so.   Within the separate, sovereign, Constitutional structure of the Yaqui Tribe, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978), it is sufficient that defendants be told they may retain counsel at their own expense, and be allowed to do so, should they choose.   In Appellant's current case, she chose not to, repeatedly.   I will respect that choice and hold her waiver of the right to counsel to have been knowing, intelligent, and effective.

Given Appellant's peculiar familiarity with the Yaqui criminal justice system, and the effectiveness of her repeated waivers of her right to counsel, she has failed to demonstrate actual harm from any alleged defect in the various recitations made to her by the court of her rights. Not having demonstrated such harm, she has shown no reversible error, and I affirm the trial courts convictions on all counts.

**2. The trial judge did not exceed the bounds of her discretionary authority to admit the evidence entered against Appellant, and Appellant was not deprived of her rights to confront her accusers or be given a fair trial as guaranteed by the Constitution of the Pascua Yaqui Tribe and the Indian Civil Rights Act.**

Appellant's extended discourse on this topic (Appellant's Opening Brief at 36-41) may be reduced to three claims: that the trial court erred by admitting into evidence various statements that were, purportedly, hearsay; that the court further erred by allowing the prosecution to use leading questions on direct examination; and that the court wrongly allowed into evidence "irrelevant and prejudicial statements."

**A. Hearsay**

While the general rule, of course, is that hearsay (a statement made by an out of court declarant offered to establish the truth of the matter asserted) is inadmissible, 3 PYT R.Evid. 37, ("Hearsay is not admissible except as provided by these rules."), most evidence having the appearance of being inadmissible hearsay is either admissible non-hearsay (e.g. party admissions

3. PYT R. Evid. Rule 38(b); FRE 801(d)(2), and out of court statements offered for some purpose other than establishing the truth of the matter asserted 3 PYT R.Evid. 36(c); FRE 801(c)), or hearsay admissible under an exception.  3 PYT R.Evid. 39, 40; FRE 803, 804. Further, even hearsay that is not admissible under a exception may be admitted, with certain qualifications, in the discretion of the court if necessary in the interests of justice (judges make that determination after examining the probative value, credibility, and possible prejudicial effect of such evidence; this is reflected in the residual exception to the hearsay rule, FRE 807, under the Federal Rules of Evidence, which the court was free to adopt, according to 3 PYT R.Crim.Proc. Rule 43(c) "whenever due process or the court require[d]") *see also Idaho v. Wright*, 497 U.S. 805, 816, 110 S.Ct. 3139, 3147, 111 L.Ed.2d 638 (1990), "[t]he Confrontation Clause is not violated if the hearsay statement falls within a firmly rooted hearsay exception; and [second] even if it does not fall within such an exception, hearsay testimony is not violative of the Confrontation Clause if it is supported by a showing of particularized guarantees of trustworthiness."

Appellant misstates the rule by treating "hearsay" as simply or "generally" inadmissible, (Appellant's Opening Brief at 36) and ignoring the wide list of exceptions to the basic rule, acting as though the mere claim that hearsay evidence was admitted would suffice to establish that it was wrongly admitted, or even that, absent any showing of prejudice, acceptance of such evidence would necessarily rise to the level of constitutional impermissibility.

Appellant makes the further, broad claim that "a substantial portion" of the evidence against her at trial was inadmissible hearsay, asserting that "rather than being the exception" the "admission of hearsay was the norm."  (Appellant's Opening Brief at 37)  Unfortunately, while she gives these vague remarks the appearance of specificity by assigning a number, eleven, to the supposed items of hearsay wrongly admitted, she offers no further substantiation of either the remarks or that number.  Nowhere does she actually cite the eleven supposed instances of

improper hearsay, the number is merely thrown out, perhaps, in part, because it exceeds another

number, ten, found to have been objectionable in the authority she cites, *Waters v. Colville*

*Confederated Tribes*, 3 CCAR 35 (1996) (Appellant's Opening Brief at 38).  Laying aside the

number eleven, I find only two concrete examples of supposed hearsay in her brief: the arresting

officer's testimony that when he presented the knife recovered from Appellant to the two victim

witnesses, minutes after their assault, they "immediately recognized" it as the weapon

brandished by the assailant, (Appellant's Opening Brief at 37 citing Transcript D at 8) and the

further testimony of that officer,

> I made contact with the victims, they said that, uh, the female subject with the long
>
> blue sleeved shirt, uh, was chasing them with the knife, pointed the knife at them, uh
>
> called her names, uh, something about I'm going to kill you fucking bitches and, uh,
>
> uh, you're laughing at me and something like that.

(Appellant's Opening Brief at 37 citing Transcript D at 8)

Both instances of "hearsay" were obviously highly relevant, 3 PYT R.Evid 6(a), (they

regarded statements by victims to the police, immediately after a crime, made for purposes of

apprehending the assailant).

Further, nowhere in Appellant's elaborate discussion does she mention the fact that the

declarants whose out of court testimony she now finds objectionable offered substantially similar

testimony in court, at her trial, subject to cross examination.  (Transcript D at 12-23, 23-32).

Even were the out of court statements of the victim witnesses to have been excluded

entirely, those statements were cumulative, mere repetitions of the testimony these victim

witness offered in court.

Nothing in the record or in Appellant's argument demonstrates that admission of these

arguably superfluous statements had the slightest effect upon her ultimate conviction.

Finally, Appellant did not object to the introduction of this evidence at trial.  Thus, according to 3 PYT R.Evid. Rule 3(a):

> Effect of Erroneous Ruling. Error may not be predicated on a ruling which admits or excludes evidence unless a substantial right of the party is affected, and (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike is made and appears on the record, stating the specific ground for the objection, if such is not obvious from the context;

Even if Appellant were to establish that the evidence was wrongly admitted by the court, she would have to further demonstrate, now, that the wrongful admission at trial was plain error.  3 PYT R.Evid. Rule 3(d); *United States v. Rich*, 580 F.2d 929, 936 (9th Cir.), *cert. denied*, 439 U.S. 935, 99 S.Ct. 330 (1978).  Plain error by the trial court would had to have affected a substantial right and materially affected the verdict; here, the evidence objected to was cumulative, Appellant has made no showing that it affected the verdict at all, let alone that it affected the verdict materially.

As Appellant has not shown that the trial court committed plain error by admitting the supposed items of hearsay into evidence, I find that the court did not abuse its discretion in doing so, any error it made was "harmless beyond a reasonable doubt" *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), resulted in no "actual prejudice" *Brecht v. Abrahamson,* 507 U.S. 619 at 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)*,* and I will not reverse her convictions in response.

**B. Leading questions**

3 PYRT R.Evid. 31 (c) concerns leading questions, the relevant portion:

> Leading Questions:  Leading questions shall not be used on the direct examination of a witness *except as may be necessary to develop the witness' testimony.*  (emphasis added)

Appellant's assertion that "leading questions are prohibited during the direct examination of a witness" is a misstatement of law.  The relevant rule of evidence 3 PYT R.Evid. 31(c); FRE 611(c) allows leading questions to be used, explicitly, whenever "necessary to develop the witness' testimony."

Furthermore, trial courts have always been given broad discretion to allow such questions under the necessity exception, *Ellis v. Chicago*, 667 F.2d 606, 613 (7th Cir. 1981); *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 12 (1st Cir. 1993) ("In this realm the widest possible latitude is given to the judge on the scene."); *St. Clair v. United States*, 154 U.S. 134, 150 (1894) ("much must be left to the sound discretion of the trial judge, who sees the witness, and can therefore determine, in the interest of truth and justice, whether the circumstances justify leading questions to be propounded to a witness by the party producing him") they may even go so far as to instruct that these questions be used, in the "interest of justice," without abusing that discretion. *United States v. Brown*, 603 F.2d 1022, 1026 (1st Cir. 1979).  Court discretion is particularly broad when, as in this case, the finder of fact is a judge, steeped in the law and charged with the responsibility to see that defendant's rights are protected, due process accorded her at trial.

Appellant simply leaves the necessity exception out of her argument.  Nowhere does she even attempt to demonstrate that the court's decision to allow leading questions was an abuse of discretion, that finding such questions necessary to develop witness testimony was error.  She just baldly, wrongly, asserts that these questions may never be used.

Further, contrary to Appellant's confused rendition of the law, while courts not only have broad general discretion to allow leading questions whenever they deem them necessary to develop witnesses testimony, they have been found to have particularly strong justification for doing so when, as here, a witness is young, timid, ignorant, unresponsive or infirm.  (Transcript D at 23-32, s*ee* the federal ruling on the FRE 611(c), substantially similar to 3 PYT R.Evid. 31(c), in *U.S.v. Nabors,* 762 F.2d 642, 651 (8th cir. 1985) which would grant the court very broad

discretion to allow such questions in this case.)  Appellant has not demonstrated that this discretion was abused, or shown clearly that allowing such questions prejudiced the verdict against her.  Absent such a showing, which would require a very high burden given the nature of the witnesses, the magnitude of other evidence demonstrating Appellant's guilt, and the fact that Appellant was given a bench, not a jury trial, I find that the court did not commit reversible error.

## C.  Irrelevant and prejudicial statements

While evidence tending to demonstrate that Appellant was a narcotics user would have been irrelevant and prejudicial if admitted into evidence at trial in this case (in which she was charged with aggravated assault, endangerment, threatening and intimidating, and disorderly conduct), (Appellant's Opening Brief at 40 citing Transcript D at 11), the record does not support Appellant's contention that such evidence was admitted, or that any brief reference to it at trial actually prejudiced her defense (made it more likely that she would have been convicted of the charges at issue than if the reference had not been made).

The exchange referenced by Appellant in her brief (Appellant's Opening Brief at 40) regarded one question by the prosecutor to the arresting officer.  The record demonstrates that Appellant failed to object to this question at trial, and that further, however improper and prejudicial the question may have been, the line of inquiry was immediately abandoned. (Appellant's Opening Brief at 40 citing Transcript D at 11).

Given Appellant's failure to object at trial, the standard for review by this Court, as discussed above, is plain error.  *State vs. Owens*, 112 Ariz. 223 at 228, 540 P.2d 695 at 700 (1975 ) "We need not consider, however, whether the comments were so prejudicial that they constituted reversible error because the defendant's failure to object during or just after the closing arguments constituted a waiver of any right to review on appeal." c*iting State v. Holmes*,110 Ariz. 494, 520 P.2d 1118 (1974); *State v. Kelley*, 110 Ariz. 196, 516 P.2d 569 (1973). "A party's failure to object will be overlooked only where we find fundamental error."

*citing State v. Shing*, 109 Ariz. 361, 509 P.2d 698 (1973). Having failed to demonstrate such error, or that the ultimate result in this case was different from the result that would have occurred had the question not been asked, Appellant has not shown that the court committed plain error. The convictions will not be reversed in response.

Furthermore, the burden for demonstrating such error would have been particularly high on Appellant as she was given a bench, not a jury trial, and the standards for evidence heard at bench trials are considerably broader than those at jury trials (given the significantly reduced likelihood that judges will be prejudiced as triers of fact by the admission of otherwise impermissible evidence than juries). *Harris v. Rivera*, 454 U.S. 339, 346-347 (1981) (per curiam).

**3. Nothing in the record establishes that the Court made a negative inference to the Appellant's invocation of her right to remain silent, thus she was not thereby deprived of her right to be free from self-incrimination as guaranteed by the Constitution of the Pascua Yaqui Tribe and the Indian Civil Rights Act.**

While it would have been impermissible for the judge to have commented on Appellant's refusal to testify at trial in a way that impugned her exercise of the constitutionally protected right to remain silent, *Griffin v. California*, 380 U.S. 609, 615 (1965), Appellant has failed to establish that a comment making such an impermissible inference took place. Further, she has not demonstrated that such a comment had a prejudicial effect, that her conviction on the eight counts under examination was made any more likely by this type of judicial remark than it would have been had the judge said nothing.

Again, given that the finder of fact was the judge, not a jury, and the record attests to overwhelming evidence of Appellant's guilt on all charges, it is difficult to imagine how such a showing of prejudice could have been made.

Appellant bases the claim that her right to remain silent was violated on a single statement by the judge at trial, a comment that must be interpreted to be understood (given the flawed recording) and whose interpretation is far from clear: "And the Court will also inform you that your refusal to testify is highly (inaudible) on the Court by uh, (inaudible). " (Appellant's Opening Brief at 41-42 citing Transcript D at 33)  The remark was ambiguous, at best, and is not in itself sufficient to demonstrate Appellant's contention that her silence at trial was impugned by the court.

Even were the remark to be given the interpretation provided by Appellant in her brief (Appellant's Opening Brief at 41-42), which is to say the most negative interpretation possible, she would still have to establish that it had a prejudicial effect.  She has not done so, and there is little reason to believe that it did, as discussed above.  The statement upon which Appellant attempts to rest this claim, however construed, is too thin a reed to sustain her assertion of reversible, constitutional harm.  I find, further, that, however read, it was "harmless beyond a reasonable doubt," *Chapman v. California* 386 U.S. 18 at 24, 87 S.Ct. 824 at 828 (1967), as Appellant has failed to demonstrate the existence of any possibility, let alone a reasonable possibility, that it contributed to her conviction.  *Fahy v. Connecticut*, 375 U.S. 86-87, 84 S.Ct. 229, 230, 231, 11 L. Ed. 2D 171 (1963).

**4. The trial court properly exercised jurisdiction over the Appellant.**

The Pascua Yaqui Tribal Court has subject matter jurisdiction to hear criminal charges brought against Indians (member and non-member) for violating Pascua Yaqui criminal law on the Yaqui Reservation.  3 PYTC  § 1-1-20(a); *Oliphant v. Suquamish Indian Tribe*, 453 U.S. 191, 208 (1978); 25 U.S.C. § 1301(2); *U.S. v. Lara,* 124 S.Ct. 1628 (2004).  Indian status of a defendant must be determined to establish the Tribal Court's criminal jurisdiction.  *In re Certified Question*, No. 98AC00004 (Hopi 2001).

Contrary to Appellant's lengthy, speculative contentions, (Appellant's Opening Brief at 44-45) it is not difficult to establish that a defendant is an Indian; this may be done simply, quickly, and conclusively, generally by the submission of a Certificate of Indian Blood to the court. *United States v. Lawrence*, 52 F.3d 150, 152 (8th Cir. 1995) *citing St. Cloud v. United States*, 702 F.Supp.1456 (D.S.D. 1988) ("Recognition" analysis: "Those factors, which the Court considered in declining order of importance, are: 1) tribal enrollment; 2) government recognition formally and informally through receipt of assistance reserved only to Indians; 3) enjoyment of the benefits of tribal affiliation; and 4) social recognition as an Indian through residence on a reservation and participation in Indian social life.").  Tribe's Exhibit 1 (Index listing #13 Certificate of Indian Blood for Beatrice Miranda.  Enrollment #2694U04548.) is a Certificate of Indian Blood for Beatrice Miranda, containing Appellant's name, birth date, and tribal enrollment number.  Eligibility for enrollment requires at least ¼ degree Pascua Yaqui Blood.  Art III § 1(b) PYT Const.; *see United States v. Torres*, 733 F.2d 449, 455 (7th Cir. 1984) *citing Alvarado v. United States,* 429 U.S. 1099, 97 S.Ct. 1119, 51 L.Ed.2d 547 (1977) (tribal enrollment and one-fourth Indian blood is sufficient proof that one is an Indian); *United States v. Broncheau*, 597 F.2d 1260, 1263 (9th Cir.), cert. denied, 444 U.S. 859 (1979).  Appellant contends that this Certificate was either never submitted to the court, or that, in the alternative, Appellee produced insufficient foundation to authenticate it.  (Appellant's Opening Brief at 46-47).

Appellant seizes upon an inaudible portion of the trial transcript (Appellant's Opening Brief at 46 citing Transcript D at 3-33) to make the claim that this Certificate was never "offered, or admitted into evidence,"  and that the Tribe thus "failed to introduce any evidence whatsoever regarding Miranda's alleged status as an Indian."   (Appellant's Opening Brief at 46)  Appellant may think it "curious" that the Certificate of Indian Blood was included in the record on appeal, as "Tribe's Exhibit 1," but the Certificate was included in the record on appeal because it was part of the record at trial, and it was part of the record at trial because it was submitted to the

Court and entered into evidence.  Appellant's claim that the Certificate was not submitted to the Court can not be reconciled with the fact that it was in the record.  It is not necessary to have an audible recording of the Certificate' submission to the Court for it to have been properly submitted, the document's presence in the trial record amply demonstrates that it was admitted into evidence.

Further, pursuant to Rule 53, PYT Rules of Evidence,

> The contents of an official record, or of a document authorized to be recorded or filed and actually recorded or filed, including data compilations in any form, if otherwise admissible, may be proved by copy, certified as correct in accordance with Rule 48(D) or testified to be correct by a witness who has compared it with the original.

the Certificate of Indian Blood was a self authenticating Public Record, and thus need only to have been submitted to have been properly admitted as evidence.  Appellant's claim that further foundation was required to authenticate the document is false.

As a Certificate of Indian Blood demonstrating Appellant's Indian status was submitted to the court, the Tribe met its burden at trial to establish that Appellant was in fact an Indian and that the Pascua Yaqui Tribal Court had subject matter jurisdiction to hear the charges filed against her.

**5.  The trial court's conviction of Appellant on counts five and six of the complaint was proper.**

Appellant compounds her faulty claim that the Tribe failed to demonstrate subject matter jurisdiction by making the strange, wholly erroneous, argument that the Tribe further failed to prove, beyond a reasonable doubt, that she was an "Indian," and that therefore she was wrongly convicted on counts five and six of the charges brought against her.  (Appellant's Opening Brief at 47-48).

Counts five and six concerned "threatening or intimidating", 4 P.Y.T.C. 1-260:

Any Indian who, with the intent to scare or terrify, threatens or intimidates another person by word or conduct so as to cause physical injury to another person or serious damage to property of another person, or causes another person to reasonably believe that he/she is in danger of receiving physical injury or damage to property, shall be guilty of an offense.

Contrary to Appellant's fanciful interpretation of this statute, use of the word "Indian" in the crime's definition did not make being an Indian into an element of the crime, any more than use of the more usual word "person" would have made being a "person" an element of the crime. As the Tribe has no jurisdiction to hear claims against non-Indians, it may not prosecute a person under Tribal Law unless that person is an Indian. The words Indian and person are thus wholly interchangeable for purposes of Indian criminal statutes.

Having established Appellant's Indian status for purposes of jurisdiction, the Tribe had no further burden to demonstrate that she was an Indian. Appellant does not contend that the Tribe failed to prove beyond a reasonable doubt that she was guilty of any actual element of the crime of threatening and intimidating, so her conviction for that crime, on Counts Five and Six, was proper and is affirmed.

**6. The sentence imposed by the court of nine hundred and ten (910) days did not violate the Indian Civil Rights Act.**

Under the Indian Civil Rights Act, 25 U.S.C. § 1302(7) , and the Constitution of the Pascua Yaqui Tribe, Art. 1, § 1(g) PYT Const., the court may not impose a sentence exceeding one year's imprisonment for conviction of any one offense. Appellant contends that these statutory limitations act to bar any sentence exceeding one year's imprisonment, period, even if a defendant is convicted of multiple offenses, provided those offense are part of "the same criminal transaction" or "course of conduct." (Appellant's Opening Brief at 51-54, "It is clear

that Congress intended to adopt the concept that separate crimes arising from a single criminal episode should normally be treated as a single offense for sentencing purposes.")

Appellant's contention is a misstatement of law and flies in the faces not only of the plain language of the statute in question (which restricts the sentences for "any one offense" not the sentencing of "all offenses" cumulatively) but also the law as it has been construed and applied in Indian Country universally since the passage of the Indian Civil Rights Act in 1968.

Contrary to Appellant's assertion, the phrase "any one offense" is not ambiguous and the purported standard she offers to interpret it is neither controlling on this court nor a correct statement of law as applied within the United States at either the Federal or State level.

Appellant puts forth a "same transaction" test to make the claim that the language "any one offense" must be read to mean that no more than one offense may be charged against a defendant, however many crimes she commits, if those crimes are part of a "single criminal episode"  (Appellant's Opening Brief at 54-55)  She cites *Spears v. Red Lake,* 363 F.Supp. 2D 1176, 1178 (D. Minn. 2005), which is not binding on this court, and a concurrence, *Ashe v. Swenson,* 397 U.S. 436, 449-54 (1970) (Brennan, J., concurring), which is not binding on any court, to support this theory.

What Appellant does not cite is the law that is binding in Arizona, and the United States generally, as articulated by the Arizona Supreme Court , *State v. Barber*, 133 Ariz. 572, 576, 653 P.2d 29, 33 (App. 1982), *State v. Eagle*, 196 Ariz. 188, 190, 994 P. 2d 395, 397 (2007), and the United States Supreme Court, *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932).  While decisions of the Arizona and United States Supreme Courts are not controlling authority in this court, they are highly persuasive, particularly when they reflect the majority, or unanimous, legal opinion regarding construction of a disputed term or phrase substantially similar to the term or phrase under examination.  Indeed, the authority of the United States Supreme court is particularly instructive here, as Appellant purports to base her argument

upon a construction of the Indian Civil Rights Act, a statute enacted by the United States Congress.  The presumption that language in such a statute was intended to have the meaning accorded similar language by the Supreme Court is difficult to overcome, and was not overcome by Appellant in her attempt to impose an alternate, unique, construction.

Under *Blockburger*, as restated in *State v. Barber, State v. Eagle,* and drawn from a venerable understanding of the meaning of the phrase "same offense" given expression in *Morey v. Commonwealth*, 108 Mass. 433, 434 (1871),

> A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.

The construction of the phrase "same offense" given in *Blockburger* is the construction that is nearly universally controlling now and the construction that controls interpretation of that phrase within the Indian Civil Rights Act, namely, that so long as conviction of one statutory crime requires proof of at least one additional element not required to be convicted of a different crime, the two crimes are separate offenses.  *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932)  As separate offenses, a defendant may be properly charged with both, convicted of both, and sentenced separately for both.  While Appellant could not have been sentenced to a term of more than one year for any one offense, she was not convicted of one offense, but eight, and sentenced separately for each.

Appellant attempts to circumvent this construction through a purported recitation of the statutory history of the Indian Civil Rights Act, (Appellant's Opening Brief at 51-52), the balance it supposedly struck between federal and Indian jurisdiction over crimes, (Appellant's Opening Brief at 52-54), and the "absurd result" that would, in her claim, be the product of using the *Blockburger* test to interpret its language, offering her own "single criminal transaction" test as

the "clear" expression of Congressional intent, (Appellant's Opening Brief at 54), even though that test never appeared anywhere in the legislative history of the Indian Civil Rights Act, was not the meaning accorded the phrase "same offense" under federal law when the statute was enacted, and has only been applied by one court, in *Spears*, since that statute went into effect. *See United States v Dixon*, 509 US 688, 704, 113 S Ct 2849, rejecting this interpretation of "same offense", "That test inquires whether each offense contains an element not contained in the other;", further "but there is no authority, except *Grady*[overturned], for the proposition that it has different meanings in the two contexts. That is perhaps because it is embarrassing to assert that the single term 'same offense' (the words of the Fifth Amendment at issue here) has two different meanings-that what is the same offense is yet not the same offense."; 125 L Ed 2d 556(1993) and *Carter v McClaughry*, 183 US 367, 394-395; 22 S Ct 181; 46 L Ed 236 (1901) further "Having found the relator to be guilty of two offenses, the Court was empowered by the statute to punish him as to one by fine and as to the other by imprisonment. The sentence was not in excess of its authority.  Cumulative sentences are not cumulative punishments, and a single sentence for several offenses, in excess of that prescribed for one offense, may be authorized by statute. *c*iting *In re De Bara*, 179 U. S. 316; *In re Henry*, 123 U. S. 372.  Finally, *Ramos v. Pyramid Lake Tribal Ct.*, 621 F. Supp. 967, 970 (D. Nev. 1985), examining consecutive sentences under the ICRA,

> "This Court could find no cases holding that the imposition of consecutive sentences constitutes cruel and unusual punishment. Indeed, the imposition of consecutive sentences for numerous offenses is a common and frequently exercised power of judges. Ramos was found guilty by the Pyramid Lake Tribal Court and sentenced accordingly to those findings of guilt. He may be unhappy with the sentence he received, but there was no violation of his right against cruel and unusual punishment and, thus, no habeas relief lies."

Appellant cites *Griffin v. Oceanic Contractors,* 458 U.S. 5644, 575 (1982)

> Interpretation of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative history are available.

No interpretation would be more absurd in this case than one that reversed the meaning the law had for four decades and straightjacketed Indian courts, reducing them to one year, maximum, sentences of imprisonment, however many crimes an Indian offender has committed against Indians on Indian land, whenever, as is usually the case, those crimes were part of a "course of conduct" "criminal episode" or "criminal transaction." Such a ruling would reduce Indians to life on reservations where their own courts cannot maintain order and federal courts will not. I reject that interpretation, and choose instead to follow the essential principles of the *Blockburger* test.

Furthermore, I recognize that Indian courts have wider discretion to apply this test then federal or state courts, discretion derived both from their status as separate sovereigns (whose sovereignty antedates the existence of the United States) and from compelling, particular interests they have in maintaining order and the rule of law in Indian country. The reality, as long recognized by federal courts, is that Indian courts have primary responsibility to dispense justice to Indian victims of crimes perpetrated by Indians on Indian land. While the Federal Government of the United States curtailed much of the sovereign authority of Indian courts through the Major Crimes Act, 18 U.S.C. § 1153, and the Indian Civil Rights Act, it did not destroy that authority, or abrogate the fundamental responsibilities of those courts. *United States v. Montana*, 450 U.S. 544, 564 101 S. Ct. 1245 (1981) *citing United States v. Wheeler*, 435 U.S. 313, 323-326 (1978). Indeed, the federal government has manifested a general unwillingness to take jurisdiction over crimes committed by Indians in Indian country, which leaves Indian courts as the sole effective guarantors of safety, order and justice for Indians living on Indian land. To fulfill that crucial role, Indian courts are, and must be, accorded greater discretion to charge

criminals and mete out sentences than federal or state courts operating more simply within the confines of the *Blockburger* test.

Accordingly, I find that the court acted properly, under *Blockburger*, and within the wide latitude Indian courts have to charge and sentence criminal defendants, by hearing the charges filed against Appellant, convicting her, and imposing the sentence she received. Each charge heard against Appellant required that sufficient additional facts be proven to satisfy the expansive form of the *Blockburger* test I am applying. Further, Appellant was not convicted of eight separate charges against one victim, as her Brief implies, but of four sets of charges against two separate victims, making the sentences actually handed down particularly appropriate. When making this sentence, the court took notice of her prior criminal record, (Transcript E at 7-8, Appellee's Response Brief Appendix B, CR-05-036, CR-05-278, CR-07-064), the fact that she was on probation when the crimes occurred, (for conviction in CR-07-064), and the possible future threat she might pose to the continued safety of the victims in this case (Transcript E at 5-6); it then gave her credit for time served, reducing the actual sentence imposed considerably (subtracting one hundred and fourteen days from the sentence to be served, Transcript E at 9-10) and ran several of the sentences concurrently, further moderating their impact (Counts Three, Four, Seven and Eight, Transript E at 7-8, subtracting 240 days from the actual sentence).

The trial courts judgment on all counts is affirmed.

**Temporary Stay**

On this portion of my decision I am issuing a temporary stay effective until April 30th, 2009, as questions regarding the breadth of discretion given to the Pascua Yaqui Courts to hear multiple charges and confer sentence are fundamentally political in nature. The legislative drafters of the Constitution of the Pascua Yaqui Tribe made a deliberate effort to harmonize Art. 1, § 1(g) PYT with its counterpart in the Indian Civil Rights Act, 25 U.S.C. § 1302(7). Both inform the reader that the court may not impose a sentence

exceeding one year's imprisonment for conviction of any one offense.  And yet, the

Appellant's interpretation leads one to conclude that these statutory limitations act to bar

any sentence exceeding one year's imprisonment, period, even if a defendant is convicted

of multiple offenses, provided those offenses are part of "the same criminal transaction"

or "course of conduct."

 Questions regarding the interpretation and breadth of discretion conferred upon

the Pascua Yaqui Courts by the Constitution to hear multiple charges and confer sentence

are fundamentally political and reside within the domain of the Legislative branch.

Moreover, the culture, traditions, and separate sovereign structure of the Pascua Yaqui

Tribe make it appropriate that questions of significant policy be decided by the legislative

than the judicial branch of our government.  Accordingly,  I am submitting to the

Attorney-General the question as to (1) whether or not Art 1, 1(g) of the Pascua Yaqui

Constitution is to be interpreted in harmony with the Indian Civil Rights Act; and (b)

whether the two must be interpreted – and thus applied - by the Pascua Yaqui Courts

pursuant to the Appellant's more formalistic construction.

 Given Appellant's declaration at oral argument (March 17, 2009) that she intends to use

this Court's disposition to perfect her filing of a habeas corpus petition in federal district court, I

consider it of paramount importance that the legislative branch of the Yaqui government make a

concrete determination of these disputed points of policy before our order concerning them is

given full effect.  The impact of the delay resulting from the stay will be minimal as counsel for

the Appellant, Mr. Fontana, has made it abundantly clear that he intends to file a writ of habeas

corpus in federal district court.  And yet, during the March 17 hearing it was apparent that the

decision sought by the Appellant will have far reaching public policy implications for offenders

convicted in the Pascua Yaqui Courts.  Thus, before the Appellant moves to pierce the veil of

tribal sovereignty at federal district court, the Pascua Yaqui Court of Appeals will continue to hold jurisdiction over this matter until the stay expires in light of the constitutional issue.

At first blush, this may not appear to be a conventional remedy in the Pascua Yaqui Tribal Courts – despite being employed by Appellate Courts in other jurisdictions.  And yet, by close analogy matters before the Tribal Courts where the Tribe is not a party and tribal sovereignty is at issue the Constitution prescribes clear notice requirements pursuant to Section 20, 3 PYTC § 2-5-20.  In sum, I consider it to be of paramount importance that the legislative branch of the Yaqui government make a determination of the disputed points of policy before my order concerning them is given full effect.

### IV. CONCLUSION

The Tribal Court's decision is affirmed on all counts.  A temporary stay with respect to the foregoing issue will be in effect until April 30th, 2009.  As I have already ruled on every issue, absent a response by the legislative branch removing the stay will simply affirm my decision that has already made - not reverse it.

Filed this 29th day of March, 2009.

_____

Chief Justice

Pascua Yaqui Court of Appeals